[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action for dissolution of marriage and other relief brought to the Judicial District of Danbury. Many of the facts that give rise to this action are not in dispute. The CT Page 7767 plaintiff, whose maiden name is Karen L. Kelley, and the defendant, were married in New Fairfield, Connecticut, on January 17, 1981. The plaintiff has resided continuously in the State of Connecticut for at least twelve months immediately prior to the date the complaint was filed. The marriage between the parties has broken down irretrievably without any reasonable prospects of reconciliation. There are two minor children, issue of the marriage, Kelly Anne Cunningham, born September 28, 1983, and Daniel Patrick Cunningham, born October 10, 1986. No other minor children have been born to the plaintiff wife since the date of the marriage of the parties. Neither party has received state assistance.
The plaintiff's marriage to the defendant is her first marriage. The plaintiff has a high school degree and some credits toward a bachelor degree. Except for short periods that she took off following the birth of each child, she has worked throughout the marriage. The plaintiff is employed at Boehringer as a Systems Analyst. She has worked for Boehringer for the last ten years. She works on the main frame computers. As a result of consolidation and re-engineering of certain functions, her position at Boehringer will terminate. The exact termination date is unknown, although it is anticipated to be July 31, 1997. She received her termination notice by letter dated September 4, 1996. Following her termination date, she will receive two months salary, but will not be required to report to work during that two month period. She will also receive a ten month lump sum payment, less applicable withholding taxes. She will also have medical benefits. After September, 1997, her COBRA costs for herself and the two children will be between $600 to $700 monthly. She has not located a new job.
The plaintiff was born on August 5, 1951.
The plaintiff is in good physical health. She is presently in therapy.
The plaintiff has been on medication for depression since 1994. She has seen a counselor since 1994. She has had depression from prior to 1994.
The plaintiff operates a 1995 Dodge which she leases. The furniture at the home has a fair market value of $10,000. She has a joint Schwab account with her mother with a fair market value of $143,029. All of the funds in that account are her mother's CT Page 7768 funds. The joint Schwab account with the plaintiff and her mother was opened in February of 1996. The stock that went into that account, at the time the account was placed in both names, was in the plaintiff's mother's name only. Part of the plaintiff's attorney's fees has been paid from that Schwab account and is part of the loan that the plaintiff owes to her mother. Her mother is seventy-four years old and not in good health. The account was put in her name for estate tax purposes only. Her mother has another account with the plaintiff's sister's name on that account that involves checking and savings. The plaintiff has life insurance with her employment that would terminate when her job terminates. She has a Boehringer 401K savings plan with a total value of approximately $79,400. She is fully vested. She has a loan on that plan that was originally in the amount of $26,300, and now has a balance of $14,380. The original amount was used for the Frat House, Inc. The balance in the plan of $65,072.44 is the balance remaining after deducting the outstanding loan balance. She owes her brother, Tom Kelley, $2000 that was borrowed to pay a 1992 income tax penalty. She owes $13,000 to her mother, Violet Katros, for loans that were obtained over a period of time. Part of the money was used for her own attorney's fees, part of it was used for paying bills, and part of was used for the Frat House. She has a VISA-Capital One account with a balance of $2957 that was used for her own purposes only for clothing and other items. Her financial affidavit shows that she owes the October mortgage payment. The mortgage payment that is due is actually January, 1996. There are delinquent taxes due of $480 on the lot that is adjacent to the family home. The plaintiff will be paid 11.2 months salary in a lump sum after she has received her two months continuation salary following the date her employment terminates.
As of December 31, 1992, the plaintiff had contributed $26,494.14 to her 401K plan, and her employer had contributed $13,464.17.
The plaintiff will not have any difficulty in finding new employment.
The parties purchased the family home that they own prior to the marriage on August 17, 1979. They moved into the home in 1980. The purchase price was $76,000. The home was financed in part through a first mortgage in the amount of $66,000. Both the deed to the property on the first mortgage were taken out in the defendant's name only. The balance of $10,000, that was required CT Page 7769 to complete the purchase, came from funds of the defendant. On June 3, 1994, the defendant quitclaimed his interest in the family home to the plaintiff. The court finds that the fair market value of the family home is $225,000, that it has a mortgage with a balance of $106,697.72, and an equity $118,302.28.
The parties purchased in both names a lot adjacent to the family home on December 22, 1983 for $24,000. They still own that lot. The parties are in dispute as to fair market value of that lot. From the evidence presented, the court finds that the fair market value is $75,000. The lot does not any mortgage. The source of the money to purchase the adjacent lot is from the defendant's savings when he was employed at American Can.
The $10,000 down payment that the defendant used towards purchasing the family home came from the sale of a home that he had owned in Iowa.
The parties purchased a condominium in 1988 in Quincy, Massachusetts, for $130,000. It was purchased as an investment with the parties intending that the plaintiff's mother would reside there and pay rent of $800 monthly. The plaintiff's mother still resides there. She has paid the rent since she took possession. The parties are in dispute as to the fair market value of the condominium. The court finds that the fair market value is $115,000, that it has a mortgage with a balance of $97,911.29, and an equity of $17,088.71.
The monthly mortgage payment for principal, interest, and taxes is $1059. Twenty-six thousand dollars of family funds was used towards the purchase of the condominium. The $259 monthly difference between the mortgage payment and the rental income, plus the average monthly condominium fees of $150 per month, has resulted in the parties having a monthly shortfall of approximately $400. The approximate $400 monthly shortfall has come from their own funds.
During the time the parties have owned the condominium in Quincy, Massachusetts, they have deducted on their income tax return depreciation as well as other expenses. In the calendar year 1990, they took a taxable loss of $17,518 on the condominium. In the calendar year 1991, they took a taxable loss of $18,960.33 regarding the condominium. In the calendar year 1992, they took a taxable loss of $13,273.47 regarding the CT Page 7770 condominium.
The parties obtained the refinancing of the family home on June 13, 1994, which was used in part for funds for the Frat House. As part of the loan application under the category of "other assets," the plaintiff listed furniture with a cash or market value of $60,000. The defendant claims that the $60,000 that was shown under furniture in fact represented a one-half interest that the plaintiff had in her mother's Schwab account. The court finds that that claim is not credible and, in fact, the $60,000 shown was for furniture only. The defendant further claims that was an oral contract that he and the plaintiff had with the plaintiff's mother for them to have security for the condo consisting of the plaintiff's mother's Schwab account. That claim is not credible.
The parties are in dispute as to the value of the condominium. The court finds its fair market value is $115,000. It has a mortgage balance of $97,911.29 and an equity of $17,088.71.
The defendant's marriage to the plaintiff is his second marriage. He has a child from his first marriage who is twenty-four years old. That child resides with the defendant's ex-wife.
The defendant has a college degree and is a C.P.A. Between 1979 and June, 1986, he was employed by American Can earning approximately $60,000 a year. He was next employed by Argus in April, 1987, until October 31, 1988, with annual salary in the mid-$70,000 range. He was thereafter employed by Potash from approximately November, 1988, to June, 1992, at a salary in the range of $80,000 per year.
The defendant was born on March 27, 1950.
The defendant is in good health.
When the defendant married the plaintiff, he owned what is now the family residence together with furniture, his automobile, a checking account, and some jewelry.
As of December 31, 1992, the defendant had $45,809.93 in his Charles Schwab brokerage account. That account was in his name only. CT Page 7771
The defendant has approximately a $1700 balance in his account with First Fidelity that is not shown on his financial affidavit.
The defendant has liabilities totalling $44,963. Those are corporate liabilities that the defendant has guaranteed and are itemized on his financial affidavit.
The defendant opened a business called Frat House, Inc. in September, 1994. This business had two separate components, namely, an entertainment center and an educational center. The entertainment center stayed in business until the fall of 1996. It was an arcade with video games. The educational center was used to provide computer training. Funds that were advanced for the Frat House consisted of the following: (1) $26,300 from the plaintiff from a loan that she secured from her 401K plan; (2) $55,000 from the remortgaging of the family home; (3) $12,000 from joint savings accounts that the parties accumulated during the marriage; (4) a miscellaneous source of $10,000; (5) the defendant cashing in a life insurance policy on his life for $24,000; (6) the defendant cashing in his Schwab account for $80,000; (7) the defendant borrowing $17,000 from his retirement savings plan.
The family home was refinanced on June 13, 1994 for $113,500. The initial mortgage used to acquire the property was paid off in full from the refinancing. Approximately $55,000 from the refinancing was invested into the Frat House.
The funds invested into the Frat House were used in part towards purchasing eighteen computers at a cost of $4500 to $5000 each.
The Frat House expended approximately $25,600 for leasehold improvements. It also paid approximately $30,000 for furniture and fixtures. The Frat House opened on Labor Day of 1994. Additional funds were invested in the Frat House in 1995. The Frat House has a claim against Carol Driscoll for approximately $30,000. The Frat House does have liabilities.
The 1995 tax return for the Frat House, Inc. shows total assets of $93,195. It shows total liabilities of $185,451. Of that amount, $161,148 is due to the defendant for loans advanced to the Frat House. He is able to withdraw that amount of money CT Page 7772 tax free in repayment of loans.
The plaintiff stopped her involvement in the running of the Frat House in April of 1995.
On December 30, 1995, the plaintiff tendered a formal resignation as director and president of the Frat House.
In the calendar year 1995, the Frat House wrote checks to the plaintiff totalling $3000.
As of April 30, 1995, the value of the defendant's Charles Schwab brokerage account was $76,657.63. All of that fund was advanced into the Frat House by the defendant.
The Frat House leases an automobile that the defendant operates and pays that lease as a business expense. The monthly payment is $210.94. It also pays for insurance and other vehicle expenses.
Compu Quest was formed at the end of 1995.
The corporation had gross income for approximately five months in 1997 of $42,500. Its gross profit after deducting business expenses is approximately $15,000 for a five month period. That amounts to approximately $700 gross weekly income, less deductions for taxes, which the court is using in determining child support guideline amounts.
Compu Quest does have liabilities. The corporation had total assets for the end of 1994 of $115,882. The Frat House was incorporated on March 17, 1993. It had gross receipts for the year ending 1995 of $112,608. It had assets totalling $115,882 and liabilities totalling $179,877. Its major liability is a loan from the defendant of $138,724.
Compu Quest is now doing all the computer training. The computers are owned by the Frat House. The primary source of revenue for Compu Quest are from a Joint Training Partnership Act, which is a federal statute that provides funds from job training. In the calendar year 1996, Compu Quest trained approximately ten persons at a charge of $2350 per trainee. It also trains persons for the Department of Social Services and is paid $1500 per person. CT Page 7773
In 1993, the defendant invested $17,000 in waterbloop quarter machines. He operated that business for approximately six months. He presently has all of the machines in storage.
The machines were put on display at various locations. The quarters that are put in the machines go in part in helping to find missing children and the balance to the defendant. The equipment is located at the family residence garage. It has not been used for two to three years.
The defendant purchased approximately fifty machines. The machines are actually a game of skill and are similar to a gum ball machine. He had thirty to forty of these machines placed at various locations during the summer of 1993. The $17,000 was transferred from an account at Union Trust Company on July 13, 1993, to an account at the Signet Bank in Baltimore, Maryland, without the plaintiff's knowledge or approval.
The parties are in dispute as to the cause of the breakdown of the marriage. From the evidence presented, the court finds that each party is equally at fault for the breakdown of the marriage.
The parties are in dispute as to whether the court should enter an order of custody or joint custody. The defendant first requested joint custody, in a motion filed on May 9, 1997, on the last day of trial. The court denies that request for two separate reasons: (1) it is in the best interests of the children that an order of sole custody enter; and (2) the defendant has not filed a motion for conciliation in accordance with § 46b-53.
This court has considered the provisions of § 46b-82
regarding the issue of alimony, and has considered the provisions of § 46b-81 (c) regarding the issue of property division, and has considered the provisions of § 46b-56 and 46b-56a regarding the issue of custody and joint custody and visitation, and has considered the provisions of § 46b-84 and the child support guidelines regarding the issue of support, and has considered the provisions of § 46b-62 regarding the issue of attorney's fees.
The court enters the following orders:
1. BY WAY OF DISSOLUTION
1. The marriage between the parties is dissolved and each CT Page 7774 party is declared to be single and unmarried.
2. BY WAY OF ALIMONY
1. No alimony is awarded in favor of either party.
3. BY WAY OF CUSTODY AND VISITATION
1. Sole custody of the minor children is awarded to the plaintiff.
2. The defendant is awarded reasonable rights of visitation.
4. BY WAY OF SUPPORT
1. The defendant is ordered to pay to the plaintiff support in the amount of $160 per week. The plaintiff is ordered to maintain health insurance for the benefit of the minor children whenever it is available through her employment.
2. The parties are to divide equally any uncovered or unreimbursed expenses for the minor children.
3. In the event the plaintiff does not have health insurance available for the benefit of the minor children through her employment, then the parties have to divide equally all medical expenses incurred for the children.
4. In the event there is any cost to the plaintiff to maintain health insurance for the benefit of the children, then the parties are to share equally in such costs.
5. In the event there is any child support arrearage arising out of pendente lite orders, then that arrearage is not merged into the judgment. Any such arrearage is to be paid at the rate of $20 per week.
5. BY WAY OF PROPERTY ORDERS
1. The court awards to the defendant all of the items shown on Schedule A, attached to the plaintiff's Request for Judgment, dated January 10, 1997, and Schedule A, attached to the defendant's Request for Judgment, dated January 11, 1997. All remaining household furniture and furnishings are awarded to the plaintiff including all jewelry and art. In addition, the CT Page 7775 defendant is awarded the waterbloop machines and his 1983 Ford Mustang. Those items are ordered to be removed from the family residence by August 29, 1997.
2. The court awards the defendant all of his interest in the Frat House, Inc. and Compu Quest, Inc. The wife is to execute whatever documents are necessary to transfer any shares of stock or stock options that she may have in either of those corporations to the defendant and to resign as officer and/or director thereof. She is to complete that transfer by August 29, 1997. The defendant is to hold the wife harmless from any claims arising out of either or both of those corporations.
3. The court orders that the defendant quitclaim to the plaintiff all of his right, title and interest in the condominium located at 58 South Street, Quincy, Massachusetts, by January 29, 1998. The plaintiff is to quitclaim to the defendant all of her interest in the lot that adjoins the family home by August 29, 1997. The court further orders that the defendant quitclaim to the plaintiff all of his right, title and interest to the family home located at 25 East View Drive, New Fairfield, Connecticut, by August 29, 1997. The deed transfers and corporate document transfers are to take place simultaneously at the office of the plaintiff's attorney.
4. The stocks, bonds and mutual funds shown by the defendant on his financial affidavit, dated January 10, 1997, with a total value of $538.50, are awarded to the defendant.
5. The pension and retirement plans that the defendant has shown on his financial affidavit, consisting of an IRA, with a value of $18,559, and a Dean Witter account, with a value of $2434, are both awarded to the defendant.
6. The mutual security credit union account, shown on the plaintiff's financial affidavit, with a balance of $126, is awarded to the plaintiff.
7. Whatever interest the plaintiff has in the joint Schwab account with her mother is awarded to the plaintiff. No part of that account is awarded to the defendant.
8. The John Hancock life insurance policy, shown on the plaintiff's financial affidavit, with a cash surrender value of $6000, is awarded to the plaintiff. CT Page 7776
9. The IRA, shown on the plaintiff's financial affidavit, with First Fidelity, in the amount of $10,000, is awarded to the plaintiff.
10. The Boehringer 401K savings plan, shown on the plaintiff's financial affidavit, is awarded split 60 percent to the plaintiff and 40 percent to the defendant by QUADRO after paying off the loan balance of approximately $14,380. The court retains jurisdiction over any disputes that may arise involving that division. This transfer is to take place by August 29, 1997.
11. The defendant's bank account at First Fidelity, with a balance of $1700, is awarded to the defendant.
12. The plaintiff is to pay all liabilities shown on her financial affidavit, except for the Boehringer loan, and is to hold the defendant harmless therefrom.
13. The defendant is to pay all liabilities shown on his financial affidavit and is to hold the plaintiff harmless therefrom.
6. BY WAY OF ATTORNEY'S FEES
1. No attorney's fees are awarded in favor of either party.
7. MISCELLANEOUS ORDERS
1. Counsel for the plaintiff is to prepare the judgment file within thirty days and file it in the clerk's office.
2. The parties are to exchange copies of their federal and state income tax returns by certified mail, return receipt, or registered mail, return receipt, within fifteen days after such returns have been filed for so long as there is an outstanding support order. In addition, the defendant is to provide to the plaintiff with copies of all corporate tax returns of all corporations in which he has more than a 50 percent interest within thirty days after such returns have been filed by certified mail, return receipt, or registered mail, return receipt, for so long as there is an outstanding support order.
Axelrod, J. CT Page 7777